BRIAN L. DAVIDOFF (SBN 102654)
BDavidoff@GreenbergGlusker.com
JEFFREY A. KRIEGER (SBN 156535)
JKrieger@GreenbergGlusker.com
KEITH PATRICK BANNER (SBN 259502)
KBanner@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687

Proposed General Bankruptcy Counsel for
Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. 2:17-bk-15292-NB |
| B&B Bachrach, LLC, | Chapter 11 |
| Debtor and Debtor in Possession. | **DECLARATION OF BRIAN LIPMAN IN SUPPORT OF FIRST DAY MOTIONS** |

*Emergency Motion For Order (1) Prohibiting Utilities From Altering, Refusing Or Discontinuing Service; (2) Deeming Utilities Adequately Assured Of Future Performance; And (3) Establishing Procedures For Determining Adequate Assurance Of Payment*

*Emergency Motion For Interim Order Approving Cash Collateral Stipulation  With Israel Discount Bank;*

*Emergency Motion For Order Authorizing Debtor In Possession To Honor Certain Pre-Petition Wages And Benefits In The Ordinary Course Of Business;*

*Emergency Motion For Interim Order Authorizing: (1) The Conducting of Inventory Liquidation, Store Closing or Similar Themed Sales; (2) The Employment and Retention of Solid Asset Solutions LP As Liquidation Consultant Nunc Pro Tunc to the Petition Date. Including Assumption of Consulting Agreement;*

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

1     *and (3) Related Relief;*

2     *Emergency Motion For Order: (1) Authorizing*
3     *the Debtor to Pay Pre-Petition Sales, Use and*
    *Similar Taxes in the Ordinary Course of*
    *Business; and (2) Directing Banks and*
4     *Financial Institutions to Honor and Process*
    *Checks and Transfers Related Thereto;*

5     *Emergency Motion For Order: (1) Authorizing*
6     *the Maintenance and Continued Use of Cash*
    *Management System; and (2) Prohibiting Banks*
7     *from Offsetting or Freezing Debtor's Existing*
    *Bank Accounts; and*

8     *Emergency Motion For Order Authorizing: (1)*
9     *Maintenance and Continuation of Certain*
    *Customer Programs and Honoring of Pre-*
10     *Petition Obligations to Customers; and (2)*
    *Continuation of Electronic Payment Processing*
11     *and the Honoring of Related Pre-Petition*
    *Obligations in the Ordinary Course of Business*

12     *Emergency Omnibus Motion For Order*
13     *Authorizing Debtor: (1) To Reject Certain*
    *Unexpired Leases of Nonresidential Real*
14     *Property Retroactively To the Petition Date;*
    *and (2) To Reject Certain Unexpired Leases of*
15     *Nonresidential Real Property Upon (i) the*
    *Closing of Each Store Pursuant to Rejection*
16     *Notice Procedures, of (ii) Completion of the*
    *Store Closing Sales*

17     *Emergency Motion For Order Limiting Scope of*
18     *Notice;*

19     *filed concurrently herewith*

20     <u>Emergency Hearing</u>
21     Date:  TBD
    Time:  TBD
22     Place:  Courtroom 1545
             255 E. Temple Street
23              Los Angeles, CA 90012

24       I, Brian Lipman, being fully sworn, hereby declare that the following is true to the best of

25 my knowledge, information and belief:

26       1.      I am the Managing Member of B&B Bachrach, LLC, a California limited liability

27 company, the debtor and debtor in possession in the above referenced Chapter 11 case ("Bachrach"

28 or the "Company").  I have been responsible for and have overseen the overall operations of the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Company since 2006.  In this capacity, I am familiar with the history, day-to-day operations, business and financial affairs of the Company.  Except as otherwise indicated, all facts as set forth in this declaration are based upon my personal knowledge, my discussion with other employees and representatives of the Company, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition.  If I were called to testify, I would and could testify competently to the facts set forth in this declaration.

2.    I submit this declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this Chapter 11 case and in support of (i) the Company's voluntary Petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on April 28, 2017 (the "Petition Date") and (ii) the relief, in the form of emergency motions, that the Company has requested of the Court (the "First Day Motions").

3.    This declaration is intended to provide a summary overview of the Company's business and the present bankruptcy case (the "Chapter 11 Case").  Section A provides an overview of the Company's business, history, organizational structure, financial conditions and pre-petition indebtedness; Section B explains the circumstances giving rise to the commencement of this case; Section C summarizes the Company's Reorganization objectives; and Section D, under various sub-headings, addresses certain facts stated in support of the First Day Motions, which the Company believes are crucial to its successful reorganization.

**A.  The Company**

**a.  The Company's Early History and Development of Bachrach Brand**

4.    Founded in 1877, the Bachrach was founded by Henry Bachrach, who opened a single store in Decatur, Illinois called "Cheap Charley" to serve the growing population of professional gentlemen who were settling in and developing the Midwest at the time.  In 1910, the name of the Company was changed to Bachrach when the word "cheap" began to take on connotations beyond merely a bargain.  Over the next century Bachrach evolved as a purveyor of fine men's clothing, becoming a brand widely recognizable across not only the Midwest, but throughout the United States.  Bachrach promotes its brand as a menswear experience based upon

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

a European fashion aesthetic, superior customer service and an emphasis on lasting customer relationships.

### b.  The Company's Prior Bankruptcies

5.      Like many retail companies, Bachrach has been no stranger to the bankruptcy court during the last decade.  In 2005, Bachrach was acquired by Sun Capital Partners, which formed Bachrach Clothing Inc. ("Bachrach Inc."), a privately held corporation based in Illinois. Bachrach Inc. inherited the Company after an aggressive expansion initiated by prior ownership, which had resulted in a peak of 79 stores nationwide.  Unfortunately, the business had expanded to many underperforming markets, leading to inventory management problems and negative cash flow.  Relatively soon after the Sun Capital Partners acquisition of the business, Bachrach Inc. filed a chapter 11 bankruptcy petition on June 6, 2006, in the Northern District of Illinois (Case No. 06-06525) (the "Bachrach Inc. Chapter 11").  At the time of the Bachrach Inc. Chapter 11 was filed, Bachrach operated 47 retail stores throughout the United States focused primarily in the Midwest.  Ultimately, Bachrach Inc. was sold through a "363" sale in July 2006 to Bachrach Acquisition, LLC ("Bachrach Acquisition"), a New York limited liability company.  The members of Bachrach Acquisition were Mr. Park, through a family trust and Ora, LLC ("Ora"), of which I was the controlling member.  Upon the acquisition of the Company, I was named the Chief Executive Officer of Bachrach Acquisition.

### c.  The Expansion of the Company and My Buyout of the Company

6.      From 2010 through 2015, the Company proved to be quite profitable.  Gross sales in 2010 were $11 million and peaked at $18.8 million by 2014.  As part of this rapid success, Bachrach opened up 17 new retail stores in 2012.  This expansion was part of a single package with landlord Simon Properties Group ("Simon"), which required that the Company lease certain less desirable "Class C" malls along with some more premier "Class A" malls .  Initially, this expansion deal enhanced the purchasing ability of the Company and markedly improved the margins, but the deal would ultimately prove detrimental to the Company, as detailed below.

7.      While the Company was flourishing in 2015, I decided to personally buyout Mr. Park's interest in the Company through a transaction which closed in January 2015.  Under the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

buyout terms, Mr. Park's shares were purchased for $3 million—$1 million was financed by

Israel Discount Bank ("IDB") in a term loan (discussed below) and $2 million was payable to Mr.

Park through a twelve month note.  Also, I replaced Mr. Park's personal guaranty on the secured

obligation to IDB by increasing my existing guaranty.  Company operations provided sufficient

cash flow to operate the business and to repay the $2 million 12-month note obligation.

### d.  Overview of the Company's Current Business

#### i.  Business Structure

8.      The Company is a California limited liability company.  I personally own 75% of

the membership shares of the Company, with the remaining 25% owned by Ora.  I also own 50%

of the membership shares in Ora, with the remaining shares owned by Bradley Lipman (25%) and

Dean Asher (25%).  I am the sole manager of the Company.

9.      As of the Petition Date, the Company operated 24 retail stores located in the

following states: Georgia, Illinois, Indiana, Kansas, Maryland, Michigan, Missouri, New Jersey,

Tennessee, Texas, Wisconsin, and Virginia.  An additional 4 stores located in Illinois, New Jersey,

and New York, were wound down and closed prior to the Petition Date.  On the Petition Date, the

Company employed approximately 151 employees (the "Employees"); approximately 89 regular

full-time employees (the "Full-Time Employees") and 62 part-time employees (the "Part-Time

Employees") (including the e-commerce employees discussed below).

10.      The Company also operates an online e-commerce retail web site with the

distribution center located in Los Angeles, California.  The e-commerce business operates under

the website url *bachrach.com* and employees seven full-time employees.  The e-commerce

business generally sells all merchandise that is available at the Bachrach stores, except for

selected clearance instore inventory which is subject to sell off.  Most online orders are shipped

from the Los Angeles distribution facility, though some orders are coordinated with and shipped

directly from Bachrach retail locations.  As discussed below, sales from *bachrach.com* have

grown over the years and the Company sees the e-commerce business as a fundamental

component of the success of the Company going forward.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

### ii. Results From Operations

11.     Over the most recent three years (2014-2016), Bachrach has generated, on average, $18.4 million in annual revenue.  Earnings before interest, taxes, depreciation and amortization ("EBITDA") was $634,000 in 2014, $710,000 in 2015 and -$100,000 in 2016. For the years 2011 to 2013, the average revenue was approximately $16 million and the average EBITDA was approximately $738,000.  Of the approximately $18 million revenues in 2016, approximately $16.8 million was generated from retail "brick and mortar" sales and approximately $1.2 million was generated from online retail sales.  Despite the size of e-commerce sales relative to the retail stores, the Company's e-commerce revenue is stable and growing, as opposed to the retail store sales which have decreased.  The Company's gross sales from online operations have were approximately $1 million in each of 2014 and 2015 and grew to $1.2 million in 2016.

### iii. The Company's Balance Sheet

12.     As of March 31, 2017, Bachrach's current assets based on its unaudited balance sheet, totaled approximately $11.33 million (this excludes cash overdrafts), and fixed assets (net of depreciation) were approximately $6.2 million.  Of the fixed assets, approximately $5.5 million accounts for tenant improvements, of which approximately $2.8 million is attributable to the Underperforming Stores (as defined and addressed below) and will therefore be written off.

13.     As of March 31, 2017, Bachrach's unaudited balance-sheet current liabilities totaled approximately $12.39 million.  This amount includes about $1.5 million in accounts payable; $630,000 in cash overdrafts; $738,000 of term loan to IDB; $9.227 million of loan payable to IDB; and $27,000 in miscellaneous liabilities.  Since March 31, 2017 the Company has received additional shipments which will increase accounts payable subsequent to March 31, 2017 to approximately $2.8 million.

### iv. The Company's Current Obligations

#### 1. Israel Discount Bank of New York

14.     As of the petition date Bachrach owes approximately an aggregate $10.57 million to IDB based on a revolving secured credit facility of approximately $9.8 million and a secured term loan with an existing balance of approximately $738,000.  These obligations are secured by

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

a perfected security interest in substantially all assets of the Company.  In addition, a blocked account is maintained and controlled by IDB in conjunction with the these obligations (the "Collateral Account") in which all sale proceeds derived from the Company's inventory is deposited.

15.    I have guaranteed up to $3 million of the IDB obligation, and have also deposited $755,000 as addition collateral which is held by IDB.

16.    The basic terms of the revolving credit facility are as follows:

> Limit On Credit Advances:  The maximum amount that can be borrowed under the revolving credit facility is the lesser of: (i) $8,966,888.89, plus the principal amount paid down on the term loan, and (ii)  $10 million.

> Formula Amount:  The Company's ability to draw on the credit facility is limited by a Formula Amount (the "Formula"), which is primarily based on the appraised net orderly liquidation value of the Company's inventory (the "NOLV") obtained annually by IDB.  The Company is able to borrow against 90% of the NOLV for any 12 weeks of a calendar year, and may borrow against 85% of the NOLV for the remaining weeks.

> Interest:  Interest accrues on the outstanding principal at the federal prime rate plus 0.25%.

17.    The basic terms of the term loan are as follows:

> Term:  The term loan is a fully amortized loan, with payments commencing March 2015 and originally due and payable on December 31, 2016.  This term was extended by IDB by amendment and now the final balloon payment is due December 2017.

> Interest: Interest on the term loan accrues in the same manner as the Revolving Credit Facility (federal prime rate plus 0.25%).

18.    IDB has agreed to a cash collateral arrangement for the Company's ongoing access to its cash flow.  It is anticipated that the amount of the secured debt obligation owed to IDB will be reduced significantly through the conducting of liquidation sales, as addressed below.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

*2.    Accounts Payable*

19.    As noted above, the Company has received additional inventory since the March 31, 2017 balance sheet, and current accounts payable total approximately $2.8 million to various unsecured trade creditors, with the largest claim of approximately $2.3 million held by Bachrach's primary supplier Maklihon Manufacturing Corporation ("Maklihon").

**B.    Events Leading Up to Chapter 11 Filing**

20.    The continuing fundamental shift in consumer behavior away from traditional mall shopping toward online-only stores and increased competition throughout the specialty retail fashion industry have created a difficult operating environment for many traditional mall-based fashion retailers such as Bachrach.  Indeed, over the past three years, several retailers in this sector, including American Apparel, Inc., Quiksilver, Inc., Caché Inc., The Wet Seal, Inc., Deb Stores, dELiA*s, Inc., Body Central Corp., Pacific Sunwear, BCBG Max Azria, Payless ShoeSource and many other retailers filed for bankruptcy protection or were otherwise liquidating.

21.    Despite the success that the Company saw in 2015 and early 2016, by July 2016 the Company started to see a general decline in sales from the "brick and mortar" retail stores.  By the end of 2016, we saw a general decline in sales across-the-board at the retail locations of approximately 10%.  Bachrach's better performing stores were previously able to carry the losses of the smaller market malls, but this general decline began to squeeze the Company's liquidity.  During the same period, Bachrach saw an increase in sales from its online business.  Indeed, this trend experienced by Bachrach is not unfamiliar and, in fact, has led to numerous recent other retail bankruptcy filings.  In light of the drop in "brick and mortar" store sales, Bachrach took swift action in late 2016 and early 2017 winding down and closing 4 stores located in Illinois, New Jersey, and New York.  Unfortunately, with so many stores with suffering sales, these actions failed to provide sufficient relief on the Company's cash flow.

22.    Despite being able to close certain poorly performing stores, in the months leading up to the Petition Date, the Company was suffering under the weight of 13 severely underperforming stores, located in Georgia, Illinois, Maryland, Michigan, Missouri, New Jersey, and Tennessee (the "Underperforming Stores"), the costs of closing which would be too great for

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

the Company to absorb outside of a bankruptcy restructuring.  This has resulted in an

accumulation of excess inventory, causing a decrease in the appraised liquidation value of the

inventory, which, in turn, has caused the revolving credit facility with IDB to exceed the Formula

(addressed above), resulting in the Company's violation of a financial covenant that the Company

has with IDB to immediately pay all amounts of the credit facility that exceed the Formula.  At

the same time, certain landlords of the Company, principally Simon, were expressing an

unwillingness to work out a restructuring of the leases relating to the Underperforming Stores.  In

the months prior to the Petition Date, we faced the grim reality that the closing of the

Underperforming Stores would incur costs we could not afford, but the keeping of those stores

would result in continuing default in the credit facility with IDB.

## C. <u>The Company's Reorganization Objectives</u>

23.      Bachrach has entered chapter 11 with a concrete plan of reorganization, which

relies on swift action.  The Company must immediately commence a series of inventory

liquidation, store closing sales (the "Store Closing Sales") selling excess inventory at the

Underperforming Stores.  The Store Closing Sales will also be conducted out of a "pop-up"

warehouse location in St. Louis, Missouri which will also liquidate excess inventory from the

Company's distribution center.  Also additional inventory may be added to the Company's

existing inventory for the Store Closing Sales. The anticipated timeline of the Store Closing Sales

process is 14 weeks from commencement of such sales.  The Company has retained liquidation

consultant Solid Asset Solutions, LLC ("SAS") through execution of a consulting agreement

dated as of April 25, 2017 (the "Consulting Agreement") to conduct the Store Closing Sales.

Proceeds from the Store Closing Sales will be used to pay down the secured debt owed to IDB.

Once all inventory from the Underperforming Stores has been moved or sold through Store

Closing Sales, the Company will vacate and close the stores, reject the leases, and turnover

possession to the landlords.  The Company also seeks to reject the leases relating to the

Underperforming Stores, with rejection effective upon the closing of the stores, in accordance

with rejection notice procedures, which the Company concurrently seeks approval of.  Time is of

the essence for the Company in this Chapter 11 Case because if the Store Closing Sales are not

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

immediately commenced and expeditiously completed, and the Underperforming Stores closed promptly thereafter, this will further squeeze the cash flow of the Company which in turn will place further pressure on the IDB credit facility and cause a potential default under the Company's cash collateral arrangement with IDB.

24.     In the weeks leading up to the Petition Date the Company retained financial consultant Robert Greenspan of Greenspan Consult, Inc. ("Greenspan") and analyzed the financial information of the Company to identify the 12 Underperforming Stores and assess the viability of the Company as a going concern if the Underperforming Stores are liquidated and closed in a chapter 11.  Working with Greenspan, we created projections indicating that a successful reorganization is possible if, and only if, the Store Closing sales are completed and all excess inventory is sold by the end of August 2017.  A true and correct copy of the projections completed with Greenspan are attached as <u>Exhibit A</u> to the Cash Collateral Stipulation filed concurrently herewith.  Failure to complete the Store Closing Sales by such time will leave the Company with insufficient capital to fund ongoing operations.

25.     The Company anticipates the prompt filing of a plan of reorganization which contemplates the closure of the Underperforming Stores, rejection of the related leases, and the retention of 11 stores (the "Retained Stores") that have consistently performed well.  The plan will also contemplate an exit financing facility which  still needs to be negotiated with IDB, a percentage payment to unsecured creditors and landlord rejection claims, and a reorganized Company whose new equity will be principally owned by me. The Company currently projects to confirm a plan by no later than the end of August, 2017].

26.     According to the Company's projections, if the Closing Stores are closed and excess inventory sold by the end August 2017, the Company will at the effective date of the plan be cash flow positive.  Also, the Store Closing Sales will result in the revolving secured debt obligation to IDB to being reduced from approximately $9.9 million to approximately $6.5 million.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

**D.  First Day Motions**

**a.  *Emergency Motion for Order (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Service; (2) Deeming Utilities Adequately Assured of Future Performance; and (3) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")***

27.    In connection with its operations the Company obtains electricity, internet, telephone, water, trash, and gas services from various utility companies (the "Utility Company(ies)") for services provided to our corporate office and distribution center located in Los Angeles, California, and the 24 retail stores leased by Bachrach.  A table that (i) lists each Utility Company, its addresses and the Company's account number(s) with such Utility Company; and (ii) specifies the type of utility service provided by each Utility Company and (iii) the average monthly payment made to each Utility Company by the Company, calculated as a historical average during the three (3) months prior to the Petition Date (where applicable) is attached as <u>Exhibit</u> 1 to the Utilities Motion.  To the best of my knowledge, I understand the list of Utility Companies set forth in <u>Exhibit 1</u> to the Utilities Motion as accurate and complete as of the Petition Date.

28.    Uninterrupted utility services to the Company office are essential to its ongoing operations and the success of its reorganization.  Moreover, we cannot easily find replacement services for the Company.  Should any of the Utility Companies refuse or discontinue services, especially electricity, internet and telephone, even for a brief period, the Company's business operations would be severely disrupted.  The impact of this disruption on the Company's business and revenue would be extremely harmful and would jeopardize the Company's reorganization efforts.  It is therefore critical that utility services from the Utility Companies continue uninterrupted.  We expect that the Company will be able to pay all of its post-petition obligations to the Utility Companies.

**b.  *Emergency Motion For Order Limiting Scope of Notice (the "Limit Notice Motion")***

29.    As of the Petition Date, there are hundreds of vendors, taxing authorities, employees and other parties to be served in this chapter 11 bankruptcy case.  Given the this large number, it would be impractical and would impose a large administrative and economic burden

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

upon the Company's bankruptcy estate if the Company were required to mail notice of every matter in this Case to all parties listed on the creditor matrix.

30.     I believe that the limited notice procedures detailed in the Limit Notice Motion are necessary and appropriate given that the creditor body is large and many of the creditors would not be interested in receiving copies of all matters, but would find service of all these motions and other documents wasteful. Requiring notice to, and service upon, so many parties, therefore, would substantially augment the cost and administrative burden on the Company, without conferring any meaningful benefit to the Company's bankruptcy estate, and thus would diminish the assets ultimately available for the operations of the Company, distributions to creditors, and reorganization of the Company.

    **c.     *Emergency Motion For Interim And Final Orders Approving Cash Collateral Agreement With Israel Discount Bank of New York (the "Cash Collateral Motion") ("Cash Collateral Motion")***

31.     It is my belief that the Company has no ability to continue to operate its business and maximize the value of the assets of its estate unless the Company has the ability to use cash collateral. Accordingly, the Company and IDB entered into the cash collateral stipulation (the "Cash Collateral Stipulation") attached to the Cash Collateral Motion as <u>Exhibit 1</u>, pursuant to which IDB consents to the Company's use of cash collateral, with certain limitations set forth in the Cash Collateral Stipulation.

32.     The Budget attached to the Cash Collateral Motion as <u>Exhibit A</u> (the "Budget") projects the Company's cash needs over 14 weeks. Also attached to the Cash Collateral Motion are monthly projections and assumptions. The projections were developed by the Company's management based upon current operating data and the best estimate of future cash needs operating in Chapter 11. The Budget and the projections have also been thoroughly reviewed and adjusted by IDB. All of the expense items in the Budget are the actual and necessary costs of operating the business that will enable the Company to continue to sell its products and service its customers. It is my belief that the Budget will both generate the projected revenue and keep expenses within the parameters set forth in the Budget.

**GREENBERG GLUSKER FIELDS CLAMAN**
**& MACHTINGER LLP**
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

*d.* ***Emergency Motion for Order: (1) Authorizing Debtor in Possession to Honor Certain Pre-Petition Wages And Benefits In The Ordinary Course Of Business; (2) Authorizing the Administration and Maintenance of Employee Benefits and Programs; (3) Authorizing the Assumption of Agreement With Modern HR, Inc.; (4) Directing the Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto; and (5) Granting Related Relief  (the "Employee Wages Motion")***

33.     To the best of my knowledge, the table attached as <u>Exhibit 1</u> to the Employee Wages Motion is a true and accurate reflection of the pre-petition wage obligations owed by the Company to the Employees.

34.     The Company's payroll is disbursed by Modern HR, Inc. ("Modern HR") which administers and manages the Company's payroll and employee benefit programs pursuant to a Client Services Agreement (the "Modern HR Agreement").  I recognize and acknowledge that, despite the copy being unexecuted, a true and correct copy of the Modern HR Agreement is attached to the Employee Wages Motion as <u>Exhibit 2</u> .  In order for Modern HR to timely process the Company's payroll according to its established payroll cycles, we must provide payroll data, and wire sufficient payroll funds to Modern HR no later than one business day before the pay date.

35.     It is my belief that if Modern HR were to discontinue services the harm to the Employees would be tremendous, which could potentially result in a delay of payroll or a disruption of Employee benefits.

36.     The Company is current on all pre-petition obligations to Modern HR under the Modern HR Agreement.  The Modern HR agreement also may be terminated by Company upon 30 days' written notice by Company.  I believe that assumption of the Modern HR Agreement represents a sound exercise of the Company's business judgment and is in the best interest of the Company, its bankruptcy estate and all creditors.

37.     I believe that the Employees are critical to the Company's successful operations and its reorganization efforts.  In addition to conducting the Company's general operations including sales, purchasing, warehousing, merchandising, marketing, billing and shipping, some perform crucial administrative and financial management services needed to operate the

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Company's business.  In addition to handling their current responsibilities, some of Company's corporate office employees have been, and will be heavily involved in assisting with bankruptcy.

38.    I believe that in order to prevent defections and bolster employee morale, it is essential for the Company to be able to honor its pre-petition employee obligations and to continue making payments on a going forward basis for post-petition work.  Failing to honor payroll commitments and discontinuing employee-benefit programs would at any time be devastating to our employees, but this is especially the case at this time.

39.    It has been our business practice to provide our Full-Time Employees with benefit plans and programs designed to assist them in meeting certain financial burdens and to keep employee morale positive for the benefit of the Company.  These programs include such standard benefits as paid time-off (intended to include vacation and sick time); legal holidays; bereavement leave and time off for jury duty; health, vision and dental insurance benefits; group life and disability insurance; and coverage through state insurance programs, including workers' compensation and unemployment insurance (collectively, the "Employee Benefit Programs").

40.    The Company provides Full-Time Employees with a certain amount of paid time-off each year, including time for vacation ("Vacation PTO") and sick leave ("Sick PTO", together with Vacation PTO, the "PTO"), which varies based on the Full-Time Employees' length of service and employment location.  Part-Time Employees are not eligible for PTO.  For Sick PTO, Full-Time Employees working in California earn .0334 hours of Sick PTO for every hour worked, capped at 72 hours.  For Full-Time Employees located outside of California, Sick PTO does not begin to accrue until successfully completing 90 days of service; thereafter accruing at a rate of 24 hours, annually.  Sick PTO is not a vested benefit and is not paid to the employee upon termination.

41.    For Vacation PTO, base Vacation PTO amounts do not accrue until the Full-Time Employee has achieved 6 months of service.  Thereafter, Vacation PTO accrues as follows:  from 7 months to 12 months of service, Full-Time Employees accrue 5 days of capped annual Vacation PTO; from 13 months to 48 months, Full-Time Employees continue to accrue 5 days of capped annual Vacation PTO; from 49 months to 96 months, Full-Time Employees accrue 10 days of

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

capped annual Vacation PTO; and from 97 months and beyond, Full-Time Employees accrue 15 days of capped annual Vacation PTO. Full-Time Employees with accrued Vacation PTO may not use their accrued time until successfully completing one year of service. When used, Vacation PTO is paid at the employee's regular straight time rate.

42.    The Company provides health insurance to the Employees, including medical, dental, and vision insurance (collectively, the "Health Plans"). Modern HR administers all Health Plans for the Company and invoices the Company for the employer portion of any applicable premiums. Modern HR deducts the Employees' portion of premiums from their bi-weekly wages.

43.    The Company provides its Full-Time Employees a PPO medical insurance plan through various insurance providers (the "Medical Plan"), administered by Modern HR. Of the Full-Time Employees' fixed premiums, the Company contributes up to approximately $225 per month, depending upon the type of coverage elected by the Full-Time Employee, with such Employee responsible for the premium balance. On an average monthly basis, the Company remits approximately $20,000 to Modern HR to pay the employer portion of the premiums owed on account of the Medical Plan. As of the Petition Date, the Company owes approximately $9,455 for pre-petition invoiced premiums due and owing for the Medical Plan.

44.    In accordance with applicable law, the Company offers its employees, upon separation, the opportunity to continue the medical benefits provided by the Medical Plan under COBRA. As of the Petition Date there were no former employees were covered under the COBRA program.

45.    Under the laws of various states, the Company is required to maintain workers' compensation insurance (the "WC Insurance") to provide its Employees with coverage for injury claims arising from or related to their employment with the Company. The WC Insurance coverage is administered by Modern HR and invoiced to the Company. The premiums due on the WC Insurance are assessed on bi-weekly basis based on the Company's self-reported payroll. On average, the Company pays between approximately $5,000 to $6,000 per pay period for WC Insurance premiums. As of the Petition Date, the Company owes approximately $4,244 for pre-petition invoiced premiums due and owing for WC Insurance.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

46.    It is also the Company's policy to reimburses Employees for qualified business expenses, such as work-related travel, certain of which are required in some states in which the Company operates.  For instance, Employees located in California are required to be reimbursed expenses pursuant to California Labor Code section 2802.  As of the Petition Date, the Company owed two employees reimbursement for qualified business expenses incurred in the scope of their employment.  The total of these expenses is $7,500.  The Company is unaware of additional expenses incurred by Employees prior to the Petition Date, but it is possible that certain Employees have incurred expenses pre-petition but have yet to seek reimbursement from the Company.  It is my belief that these pre-petition expense reimbursements are *de minimus* and reimbursements is necessary for the retention of these employees post-petition.

47.    It is my belief that many of our employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses to pay their daily living expenses.  Our employees and their families would suffer undue hardship if we are not permitted to pay and/or honor the wages and benefits owed to these employees.

48.    The Company will not make any payments to the insiders, including myself, Bradley Lipman, and Dean Asher, until such time as the insider compensation for us has been approved.

**e.    *Emergency Motion for Interim and Final Order Authorizing: (1) The Conducting of Inventory Liquidation, Store Closing or Similar Themed Sales; (2) The Employment and Retention of Solid Asset Solutions LP As Liquidation Consultant Nunc Pro Tunc to the Petition Date. Including Assumption of Consulting Agreement; and (3) Related Relief (the "Store Closing Sale Motion")***

49.    Prior to the Petition Date, the Company took steps to prepare for the Underperforming Stores for the Store Closing Sales, including discounting inventory, the substantial reduction of inventory and discontinuance of new inventory deliveries to the Underperforming Stores.  The Company also engaged SAS to commence the Store Closing Sales program in earnest pursuant to the Consulting Agreement.

50.    In addition to conducting the Store Closing Sales from the Underperforming Stores, our inventory liquidation plan includes the lease of warehouse space in St. Louis,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

Missouri, from which the Company will conduct a warehouse liquidation sale using excess inventory from the Company's Los Angeles distribution facility.

51.     In an effort to provide uniformity through the liquidation process while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any liquidation laws that may otherwise have applied to the Store Closing Sales outside of a chapter 11 bankruptcy, the Company and SAS have drafted the Sale Guidelines attached as <u>Exhibit 1</u> to the Store Closing Sale Motion (the "Sale Guidelines").

52.     The Sale Guidelines include provisions which represent a fair balance between the maximization of the Company's collateral, but at the same time take into account concerns that the landlords may have:: (a) Store Closing Sales may be conducted only during normal business hours; (b) leaflet or handbills may not be distributed on the respective mall properties; (c) storefronts are not to be altered, except by the hanging of exterior banners; and (d) the interior and exteriors of the stores are to be kept clear and orderly consistent with present practices.

53.     In the Months Prior to the Petition Date, the I conferred with prospective liquidating agents and assessed the costs associated with engaging a liquidating agent to conduct the Store Closing Sales.  Such prospective liquidating agents included Tiger Capital Group LLC ("Tiger") and Onyx Asset Management.

54.     It is my understanding that in the Bachrach Acquisition Chapter 11, Bachrach Acquisition employed Hilco Merchant Resources, LLC ("Hilco") as the liquidating agent to conduct similar sales.  It is further my understanding that Hilco principals involved in the Bachrach Acquisition Chapter 11 have since joined SAS.

55.     Further, it is my understanding that certain principals of SAS participated in the inventory appraisals of the Company conducted by SB Capital Group in 2014 and 2015.

56.     It is my belief that the past involvement of SAS principals in the Company's previous inventory appraisals and earlier liquidations of Bachrach Acquisition provides SAS with a unique familiarity with the Company's business that would not be found in other liquidating agents.

57.    The Company seeks to employ SAS so that the Company may leverage the experience and resources of SAS in swiftly performing the multi-store liquidation while retaining control over the sale process.  I believe this sale structure will provide maximum benefit to the estate.

58.    According to my understanding, it is not the general practice of, nor is it feasible for, the SAS to keep detailed time records similar to those customarily kept by attorneys.  As such, under the terms of the Consulting Agreement, the Company has agreed to compensate SAS for fees and expenses consistent with industry practice.

59.    To the best of the my knowledge, information, and belief, other than as set forth in the Kenny Declaration attached to the Store Closing Sale Motion, SAS: (a) has no connection with the Company, its creditors, other parties in interest, or the attorneys or accountants of any of the foregoing, or the United States Trustee or any person employed in the Office of the United States Trustee; (b) does not hold any interest adverse to the Company's bankruptcy estate; and (c), it is my understanding that SAS believes it is a "disinterested person" as defined by section 101(14) of the Bankruptcy Code.  Accordingly, it is my belief that SAS is "disinterested" as such term is defined in section 101(14) of the Bankruptcy Code.

60.    Any delay in commencing and executing on the Store Closing Sales may cause the Company to incur an additional $159,000 for each extra month's rent and an additional $35,000 to $45,000 per week in payroll and other operating expenses at the Underperforming Stores.  Therefore, if the Store Closing Sales are not permitted to go forward on an interim basis, and the Company is forced to delay the Store Closing Sales for even one week, the Company—which is already in a precarious financial state—will incur substantial administrative expenses.

61.    I have also concluded that augmenting the Company's store closing team with the support provided by SAS will ensure that those Store Closing Sales are conducted in a manner that creates the highest returns for the Company's bankruptcy estate.  I understand that the SAS has extensive experience conducting liquidation sales and can assist in the management and implementation of the Store Closing Sales in an efficient and cost effective manner.  Utilizing the SAS in connection with the Store Closing Sales will further alleviate such a burden from the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

Company, and the Company may, in turn, focus its efforts on the business operations of the remaining stores.

62.    As to the assets being sold through the Store Closing Sales, beyond the first priority lien in favor of IDB and a junior lien in favor of CC Funding, I am not aware of any other party that may assert a lien, claim, or encumbrance against such assets.  If such a claim were to subsequently arise, it is my belief that any such claim would be the subject of a *bona fide* dispute.

63.    The Company intends to fully comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising in conducting the Store Closing Sales

64.    It is my belief that the employee retention bonuses proposed in the Store Closing Sale Motion (the "Retention Bonuses") will motivate employees during the Store Closing Sales and will enable the Company to retain those employees necessary to successfully complete the Store Closing Sales.  Payment of the Retention Bonuses in connection with the Store Closing Sales will aid in maximizing the value of the Company's bankruptcy estate by inducing employees who are needed to manage and complete the Store Closing Sales to remain in the employ of the Company and to maximize the returns from such sales.  The results of the Store Closing Sales are wholly dependent on the store-level employees who will soon face termination.

65.    The terms and conditions of the Consulting Agreement were negotiated by me and the principals of SAS at arm's-length and in good faith.  The agreement has also been reviewed by IDB.  It is my belief that the compensation, indemnification and other provisions contained in the Consulting Agreement are reasonable in light of, among other things, (a) the nature and scope of services to be provided by SAS, (b) industry practice, (c) market rates charged for comparable services both in and out of the chapter 11 context by SAS and other leading liquidation consultants in the industry and (d) SAS's extensive experience conducting liquidation sales.

66.    It is further my belief that: (a) retaining and employing SAS under the terms of the Consulting Agreement is both necessary and in the best interests of the Company's bankruptcy estate and any parties in interest, as SAS's services are fundamental to the  reorganization of the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

Company as a going concern and maximization of value of the Company's bankruptcy estate for the benefit of all stakeholders; and (b) that the terms and conditions of the Consulting Agreement are reasonable and that SAS is well qualified to perform all services contemplated therein in a cost-effective, efficient and timely manner.

> **f.   *Emergency Motion For Order: (1) Authorizing the Debtor to Pay Pre-Petition Sales, Use and Similar Taxes in the Ordinary Course of Business; and (2) Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Tax Motion")***

67.     In the ordinary course of business, the Company incurs or collects and remits certain taxes, including sales, use, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees"). The Company remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the sale of Bachrach's merchandise at the various store locations, or through purchases made and fulfilled through the Company's e-commerce website, *bachrach.com*. A true and correct list of the Taxing Authorities is set forth on Exhibit 1 attached to the Tax Motion.

68.     The Company's Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid. As of the Petition Date, the Company estimates that we owe approximately $133,327 in unremitted Taxes and Fees incurred pre-petition. Any payments made will be subject to the Budget attached to the Cash Collateral Motion.

69.     The Company projects to have sufficient funds to pay any amounts related to the Taxes and Fees in the ordinary course of business. In any event under the cash collateral arrangement with IDB, 7.5% of the gross proceeds from sales is being set aside for payment of Taxes. It is my belief that there is minimal risk that checks or wire transfer requests that the Court has not authorized by approval of the Tax Motion will be inadvertently made.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

**g.** ***Emergency Motion for Order: (1) Authorizing the Maintenance and Continued Use of Cash Management System; and (2) Prohibiting Banks from Offsetting or Freezing Debtor's Existing Bank Accounts (the "Cash Management Motion")***

70.    In the ordinary course of our business, the Company maintains a cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Company's cash assets.  Under the Cash Management System, the Company utilizes 16 separate bank accounts (the "Sweep Accounts", together with the Collateral Account, the "Bank Accounts"), each managing the cash and check deposits of one or more retail stores.  The Sweep Accounts are regularly swept into the blocked Collateral Account with IDB, which is connected to the revolving secured debt facility used by Company to provide operating capital.  All credit card and other electronic transactions are deposited directly into the Collateral Account, as opposed to the individual Sweep Accounts.  Attached as <u>Exhibit 1</u> to the Cash Management Motion is a true and correct list of the Bank Accounts held at the various banks (the "Banks" and each, a "Bank") that make up the Cash Management System.

71.    The Company's Cash Management System generally operates similarly to the centralized cash management systems used by other similar companies of comparable size to manage the cash of numerous operating units in a cost-effective, efficient manner.

72.    In the ordinary course of the Company's business, retail sales occur on a daily basis and online sales can occur at any time of day, with credit cards and other electronic forms of payment potentially taking up to three business days to post.  It is my belief that any disruption in the fluidity of this system will cause immediate and irreparable harm to Company, as pending payments will unable to post for existing orders and new customer orders will be halted until new bank accounts are opened, which could take days, if not weeks to complete based on the complexity of the Cash Management System.

73.    I do not believe that the granting the Cash Management Motion will prejudice any party-in-interest or the Company's estate.

74.    In the ordinary course of the operation and maintenance of the Cash Management System, the Company has and will continue to incur fees and other charges (collectively, all such

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

fees and charges, the "Cash Management Claims") in connection with (a) Bank services; (b)

checks deposited with the Banks which have been dishonored or returned for insufficient funds in

the applicable amount; and (c) any reimbursement or other payment obligations, such as

overdrafts, arising under agreements with the Banks relating to the accounts, including, without

limitation, any pre-petition cash management agreements or treasury services agreements.

**h.** ***Emergency Motion for Order Authorizing: (1) Maintenance and
Continuation of Certain Customer Programs and Honoring of Pre-Petition
Obligations to Customers; and (2) Continuation of Electronic Payment
Processing and the Honoring of Related Pre-Petition Obligations in the
Ordinary Course of Business***

75.     In the ordinary course of our business, the Company maintains and administers

customer-related programs (the "Customer Programs") consistent with common practice in the

fashion retail industry.  The Customer Programs are a cornerstone of our customer-centered

business.  It is my belief that the Company's ability to continue the Customer Programs and to

honor our obligations thereunder in the ordinary course of business is necessary to (i) retain the

reputation of the Bachrach brand; (ii) meet competitive market pressures; (iii) maintain positive

customer relationships; and (iv) ensure customer satisfaction, thereby retaining current customers,

attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the

Company's stakeholders.  The viability of the Company's business is wholly dependent upon the

patronage and loyalty of its customers.  In this regard, the Customer Programs are critical, and

any impediment or delay in honoring the Company's obligations thereunder will harm and impair

customer relations.

76.     In the ordinary course of business, the Company sells gift cards or gift certificates

(collectively, the "Gift Cards") to customers in amounts ranging from approximately $25 to $500.

Customers can purchase Gift Cards in our retail stores and/or through our e-commerce website.

Gift Cards can be used for in-store or e-commerce purchases.  As of the Petition Date, many

customers had not yet redeemed certain Gift Cards purchased prior to the Petition Date.  It is my

understanding and belief that when such customers purchased the Gift Cards, they had every

expectation that they would be redeemable, subject to the restrictions and expirations applicable

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

to the Gift Cards upon the customer's purchase as customary to the retail industry. Based on historical practice, the Company's books and records reflect an aggregate pre-petition net liability with respect to Gift Cards of approximately $77,857.

77.    Except for merchandise identified as "clearance" or "final sale", the Company permits customers to return merchandise that is unworn, unused, and with tags attached for any reason within 14 days of original purchase for a full refund of the same tender, or within 45 days for an exchange with store credit applied in the amount of the original purchase (the "Refund and Exchange Program"). Programs similar to the Refund and Exchange Program are common in the retail industry, and similar programs are used by our competitors. In addition to the Refund and Exchange Program, the Company offers a Sale Adjustment Policy, whereby we offer a one-time price adjustment credit for any price changes that occur within 14 days from the date that merchandise has been purchased.

78.    As a result of the inherently uncertain nature of the Refund and Exchange Program and the Sale Adjustment Policy, we are unable to estimate the value of their obligations with precise accuracy with respect thereto as of the Petition Date. We do not, however, expect the commencement of the chapter 11 case to result in a significant deviation in the volume of monthly returns and exchanges from that which was experienced prepetition, which average between $80,000 and $100,000 per month, with a holiday spike in December.

79.    The Company offers online customers the opportunity to participate in a points-based rewards program (the "Bachrach Rewards Program"). Under the Bachrach Rewards Program, for online customers, participants earn and accrue reward points for purchases—for example for every $10 of merchandise purchased, the customer earns 5 points. The earned points are redeemable at the time of purchase, provided the customer has accumulated enough points in that purchase, or can be accumulated overtime through multiple purchases and redeemed for a subsequent purchase based on the cash value of the points accumulated. All points earned through the Bachrach Rewards Program are subject to an expiration date, calculated based on the date accrued. Redeemable reward points can be used in conjunction with other payment methods such as Gift Cards.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

80.    The Company also offers various promotional offers to customers throughout the year (collectively, the "Promotions").  The Promotions are aimed at driving sales, maintaining market competitiveness, and building brand loyalty.  We offer various in-store and online promotions that provide discounts to customers, such as "percentage off," "buy-one-get-one free," and "gift with purchase" promotions. Promotions are also seasonally offered from time to time, which most recently included an "Easter Sale" during which all e-commerce products were offered for a 50% discount off the merchandise's regular price and in-store merchandise was offered on a "buy-one-get-one free" basis.  We do not anticipate the need to honor any pre-petition obligation for any Promotions offered by the Company.

81.    To provide payment convenience for customers, the Company is party to certain agreements with payment processing companies pursuant to which the Company is able to accept credit cards, debit cards and other web-based electronic payments, subject to certain adjustments, returns, promotional fees and refunds.  Prior to the Petition Date, the Company entered into an agreement with Worldpay US, Inc. ("Worldpay") governing the processing, authorization and settlement of "point of sale" credit card transactions at our retail locations ("Point of Sale Processing").  Additionally, the Company is party to agreements with PayPal ("Paypal") and USAePay ("USAePay", together with PayPal and Worldpay, the "Payment Processors") which provides for the settlement of transactions through the our e-commerce website ("Online Processing", together with Point of Sale Processing, the "Electronic Payment Processing").

82.    It is my understanding and belief that Bachrach's customers rely on the ability to utilize electronic forms of payment, which constitute approximately 90% of all transactions at our retail stores and 100% of transactions through our e-commerce website, *bachrach.com*. Generally, Payment Processers facilitate an electronic purchase by first verifying and obtaining authorization for the purchase from the issuing bank of the card holder; then the issuing bank begins the payment settlement process by forwarding the applicable funds to the Payment Processor; the Payment Processor then completes the settlement process by depositing funds to the Collateral Account held at IDB, less any applicable fees.  The process for returns generally works in the reverse (though additional fees may be incurred, as discussed below).  Either the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

purchase or return process may take up to 3 business days to complete.  At any given point in time, hundreds of such transactions may in process.  Thus, it is my belief that even a relatively minor disruption to the Electronic Payment Processing caused by a bankruptcy filing could have a devastating effect in the Company's processing of customer purchases or returns; and, in turn, harm customer relations.

83.    Under the Company's agreements with the Payment Processors, the Company is required to pay the Payment Processors fees for their services, certain amounts of which may have accrued but remain unpaid as of the Petition Date.  It is my understanding and belief that if the Company is unable to continue Electronic Payment Processing of the customer's transactions in the ordinary course of business, including payment of certain pre-petition obligations, the Payment Processors may refuse service.  The Company incurs approximately $24,000 aggregate monthly fees to the Payment Processors relating to customer purchases, some of which will be attributable to a pre- petition period.  In contrast, during the twelve month period ending in March 2017, the Company paid on account of Electronic Payment Processing and related fees approximately $290,000.  This illustrates the pre-petition liability is *de minimus* compared to the enormous contribution the Payment Processing provides to our business.

84.    Further under the Company's agreements with the Payment Processors, upon a customer's return of merchandise purchased using Electronic Payment Processing, or when a customer disputes certain charges, the Company is obligated to refund to the Payment Processors the purchase price of the returned merchandise plus certain adjustments (collectively, the "Chargebacks").  Generally, Chargebacks are satisfied by netting the amount charged back against pending payments owed by a Payment Processor to the Company according to their respective agreement.  It is possible that certain Chargebacks incurred by the Company immediately prior to the Petition Date may not have been fully netted out against payments the Company received from the Payment Processors prior to the Petition Date.  Generally, the monthly Chargebacks incurred by the Company is less than $1,000.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

i.  ***Emergency Omnibus Motion For Order Authorizing Debtor: (1) To Reject Certain Unexpired Leases of Nonresidential Real Property Retroactively To the Petition Date; and (2) To Reject Certain Unexpired Leases of Nonresidential Real Property Upon the Closing of Each Store Pursuant to Rejection Notice Procedures*** ("Lease Rejection Motion")

85.    Prior to the Petition Date, the Company wound down and vacated 4 retail stores (the "Vacated Stores" and each a "Vacated Store").  As specified in the Lease Rejection Motion, in some cases, the Company exercised a pre-petition lease termination right, which was rejected by the landlord, whereas in other cases the Company vacated the store, but was unable to timely exercise any pre-petition termination rights.

86.    Given that the amount of inventory at each Underperforming Store varies, some Store Closing Sales will be completed earlier than others.  In addition, in the Store Closing Sale process, some inventory liquidation sales may not occur on the store premises and the inventory may be moved to another Underperforming Store or the "pop-up" warehouse liquidation location. For such retail locations, the Underperforming Stores will be promptly closed after inventory is moved, FF&E is sold or removed, and the property is vacated.  Accordingly, at this time, the Debtor is unable to accurately calculate the exact closing date of each Underperforming Store.

*(Signature Page Follows)*

DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS

1        I declare under penalty of perjury under the laws of the United States that the foregoing is

2   true and correct.  Executed at Los Angeles, California on this 28 th day of April    , 2017.

BRIAN LIPMAN

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

07491-00002/2785641.1       27       DECLARATION OF BRIAN LIPMAN IN
SUPPORT OF FIRST DAY MOTIONS